1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 11/10/2010**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

MARK DOUGLAS HILL,

               Petitioner,

       v.

ROSANNE CAMPBELL, Warden,

               Respondent.

Case Number 05:05-cv-4514 JF

**ORDER[1] DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

Re: Docket Nos. 1

     Following a jury trial in the Santa Cruz Superior Court, Petitioner Mark Douglas Hill ("Hill") was convicted of rape and kidnapping. Hill now seeks a writ of habeas corpus, asserting four claims: (1) that being forced to wear a stun belt while testifying interfered with his right to a fair trial, (2) that his kidnapping conviction was invalid because the jury was not required to find that he moved his unconscious victim for an illegal purpose, (3) that he was denied his right to present a defense because the trial court improperly excluded a prior consistent statement, and (4) that he was deprived of his right to effective assistance of counsel by his trial counsel's failure to investigate and obtain testimony from a corroborating witness. For the reasons discussed below, the petition will be denied.

---

[1]This disposition is not designated for publication in the official reports

1

## I. BACKGROUND[2]

2   After a nine-day trial, Hill was convicted of three counts of rape, two counts of digital

3   penetration, one count of assault by means of force likely to produce great bodily injury, one

4   count of kidnapping, and one count of forcible false imprisonment.  The jury found Hill not

5   guilty of kidnapping for the purpose of rape.

6   The charges arose from an encounter between Hill and his former girlfriend, L[3], on the

7   night of Saturday, August 15, 1998.  While it is unnecessary to spell out all of the details of their

8   troubled relationship, it is relevant to note that the events of August 15 were the culmination of a

9   long history that led to the issuance of a restraining order against Hill.  Despite the restraining

10  order, L agreed to meet Hill to celebrate Hill's departure for Texas, and the two spent the

11  evening drinking, traveling between bars in L's truck.

12  Outside the last bar,L and Hill got into an argument.  L testified that when she stepped

13  out to have a cigarette, Hill stormed out of the bar, drove up in the truck, and demanded that they

14  leave.  The bartender, who had followed Hill out of the bar, testified that at L's request he took

15  the truck keys from Hill and gave them to L, telling Hill that he wouldn't be allowed to return to

16  the bar.  L claimed that after the bartender went back inside, Hill told her to get in the truck or he

17  would wreck it, and that after asking what choice she had, she reluctantly complied.  Hill

18  testified that he did not recall talking to the bartender and that he had wanted to leave because he

19  was drunk, but that he and L returned to the bar until L was ready to leave.

20  According to L, once they were both in the truck Hill sped away recklessly, telling her

21  that he would kill them both, and drove the truck over a stop sign without stopping.  L testified

22  that Hill strangled her into unconsciousness as they drove, pulling out the truck's console to get

23  at her.  When she regained consciousness, she was on the ground and Hill was kicking her.  After

24

25  [2]The following facts are taken from the opinion of California Court of Appeal.  Pet. Ex. A
    at 1-12.  Citations to the record in the discussion refer to the Clerk's Transcript ("CT"), Resp.
26  Ex. 1, and the Reporter's Transcript ("RT"), Resp. Ex. 2.

27  [3]The Court follows the California Court of Appeal in using the victim's initial to protect
28  her privacy.

2

1   losing consciousness again, she woke as the truck drove into what she believed was a wooded

2   area on the property where Hill was staying.  Hill then told her to take off her clothes and get in

3   the back of the truck, where he had laid out sleeping bags.  She testified that Hill penetrated her

4   with his penis and fingers.  After allowing her to falling asleep, Hill woke her and asked that she

5   put his penis inside her again, though he did not ejaculate the second time.  In the morning he

6   said wanted sex again, despite L's injuries, and penetrated L with both his penis and his fingers.

7   L testified that she agreed not to call the police and to say that her injuries were caused by a car

8   accident.  As they drove from the woods, the truck got stuck on a tree stump, and Hill had to get

9   his landlord's tractor to free it.  The truck's transmission became stuck in second gear.  After

10  stopping at the house to retrieve his bedding, Hill let L go.

11        According to Hill, he and L left the bar when L was ready to leave.  He admitted to

12  hitting the stop sign, and claimed that afterward L attacked him for "fucking up her truck."  He

13  acknowledged that to stop L from slapping him, he pushed her and elbowed her away, but he

14  denied hitting her with his fist.  He stated that L fell into his lap, and as he pulled her off him, the

15  truck hit a dirt embankment.  He claimed that the accident threw L to the floor of the truck and

16  knocked the truck console from the ceiling.  An accident reconstructionist testified that the

17  damage done to the truck was consistent with the truck hitting a dirt embankment.

18        Hill testified that he drove to his house to get sleeping bags and pillows.  His housemate

19  testified that she heard him tell someone, "Don't move, don't go anywhere," as he went into the

20  house.  Hill then drove with L to the wellhead on the property; he claimed they had consensual

21  sex in the back of the truck, and when he became aroused as they snuggled, L put his penis

22  inside her a second time.  They then drove off the property to get cigarettes at the Arco station

23  and then returned to the wellhead, despite the fact that the truck was stuck in second gear.  Hill

24  states that L persuaded him to have sex a final time the following morning.

25        After the incident, Hill hid out on the property and eventually made his way to Texas.

26  He told friends that he had wrecked L's truck and he and L had "gotten into it."  He told them

27  that he had hit or beat up L and that he was not proud of it.  While in Texas, he taped a statement

28  for the police stating that his relationship with L was only about sex and that in the accident, L's

3

1  face "ripped the console on the ceiling of that truck off.  She hit her face so hard that it tore

2  completely out of the ceiling."  He did not mention elbowing her.  Hill sent the tape to a friend in

3  Santa Cruz and asked him to provide the to the police so that they would believe that Hill still

4  was in the area.  After about a week in Texas, Hill was arrested.  In an interview with the Texas

5  police, he stated that he had pushed and elbowed L away when she attacked him in the truck.

6       Hill was convicted on June 10, 1999.  On direct appeal, he asserted the same prior

7  consistent statement and jury instruction claims that are at issue here.  The conviction was

8  affirmed on January 11, 2001, and the California Supreme Court denied review on April 11,

9  2001.  Hill then sought habeas relief in the Santa Cruz Superior Court, claiming ineffective

10  assistance of counsel.  On December 16, 2002, he amended his petition to add a claim that his

11  right to a fair trial was violated by his having to wear a stun belt while testifying.  The court held

12  an evidentiary hearing, and on October 1, 2004, it denied the petition.  The state appellate and

13  supreme courts subsequently denied habeas relief.  Hill filed the instant federal petition on

14  November 4, 2005.

15                              **II.  LEGAL STANDARD**

16       Applications for a writ of habeas corpus on behalf of prisoners in custody subject to the

17  judgment of a state court are governed by the Antiterrorism and Effective Death Penalty Act of

18  1996 ("AEDPA").  Under AEDPA, a federal court reviews only the reasoning of highest state

19  court to issue a reasoned opinion addressing the petitioner's federal claim.  28 U.S.C. § 2254(d);

20  *see also Mendez v. Knowles*, 556 F.3d 757, 767 (9th Cir. 2009) (noting that a court must "look

21  through" any unexplained orders to analyze the last reasoned opinion reaching the merits of the

22  federal claim). The federal court may not grant a writ of habeas corpus unless the state court's

23  adjudication was either: (1) contrary to, or involved an unreasonable application of, clearly

24  established federal law, as determined by the Supreme Court of the United States; or (2) based

25  on an unreasonable determination of the facts in light of the evidence presented at the state court

26  proceeding.  28 U.S.C. § 2254(d)(1)-(2).

27       The Supreme Court has held that there is a difference between "contrary to" clearly

28  established law and an "unreasonable application" of that law under § 2254(d).  *Williams v.*

4

1  *Taylor,* 529 U.S. 362, 404 (2000).  A decision is "contrary to" established federal law where

2  either the state court's legal conclusion is contrary to that of the Supreme Court on a point of

3  law, or is materially indistinguishable from a Supreme Court case, yet the legal result is opposite.

4  *Id.* at 404-05.  Conversely, an "unreasonable application" of established law applies where the

5  state court identifies the correct governing legal rule from Supreme Court cases, yet

6  unreasonably applies it to the facts of the particular state case.  *Id.* at 406.  The petitioner must do

7  more than merely establish that the state court was wrong.  *Id.* at 409-10.  He must prove that the

8  state court's application of clearly established federal law was objectively unreasonable.  *Id.*

9  (stating "a federal habeas court . . . should ask whether the state court's application of clearly

10  established federal law was objectively unreasonable.  The federal habeas court should not

11  transform the inquiry into a subjective one.").

12  ## III.  DISCUSSION

13  **A.    Stun Belt**

14      Hill contends that his right to a fair trial was violated by his being required to wear a stun

15  belt during his trial, and in particular while he was testifying.  While the trial court's failure to

16  identify a specific state interest requiring the restraints was constitutional error, Hill has not

17  demonstrated prejudice.

18      **1.    Background**

19      Before trial, defense counsel alerted the trial court that the bailiff intended to "put an

20  electronic belt" on Hill.[4]  RT 21-22.  Counsel objected, arguing that the restraints were

21  unnecessary, and requested that if the court did allow the belt, Hill be permitted to remain seated

22

23      [4]  Hill was required to wear a Remote Electronically Activated Control Technology
24  (REACT) belt.  Pet. Ex. D at 17.  As described by the California Supreme Court in *People v.*
    *Mar*, 28 Cal. 4th 1201 (2002), the REACT belt is worn under the prisoner's clothing and consists
25  of a four-inch-wide elastic band that holds two prongs over the left kidney region.  When
    activated via remote control, the belt delivers an eight-second, 50,000-volt electric shock, which
26  immobilizes the individual temporarily and causes muscular weakness for thirty to forty-five
    minutes.  The wearer generally is knocked to the ground, and the shock can cause uncontrollable
27  shaking, defecation, and urination, as well as welts from the metal prongs which can take as long
28  as six months to heal.

Case No. 05:05-cv-4514 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC3)

1  in the presence of the jury so that the belt would not be seen.  The prosecutor noted that Hill was

2  "an extremely disturbed individual," who had engaged in "self-mutilation" and had threatened

3  suicide.  RT 22.  The trial judge indicated that he would discuss the security issues with the

4  bailiff and that if he did require Hill to wear the belt he would make every effort to keep that fact

5  hidden from the jury.  *Id.*  Hill was required to wear the belt at all times while he was in court,

6  including during his testimony.  Before Hill testified, the trial court asked Hill's counsel whether

7  he wanted Hill to stand during administration of the oath.  Counsel responded, "It's not very

8  visible.  I think that would be best."  RT 607.

9        At the evidentiary hearing, Hill testified that before he was required to wear the belt, the

10  police officers explained how the belt worked and demonstrated the electrical "arching" between

11  the prongs.  Pet. Ex. C at 17.  He testified that the officers told him that, "when the thing goes

12  off, you're going to shit, piss and puke all over yourself and do the Charley Tuna in front of all

13  the people upstairs."  *Id.*  He claimed that he was also told "to hold onto or put into my pocket

14  one of the bailiff's lunch so that when I was fried I could heat it up for him."  *Id.*  Hill stated that

15  the belt made him nervous and he feared that it would be activated accidently or maliciously by

16  the guards.  *Id.*  He claimed that he was concerned about the guards' intentions, because he had

17  been shoved by two of the guards and because they had allowed him to be beaten up by other

18  inmates.  *Id.* at 19.

19        Hill testified that the belt made him "very, very nervous" and made it difficult for him to

20  concentrate on the witness stand because "most of [his] focus was paying attention to who had

21  the remote and what they were doing with it."  *Id.* at 23-24.  In particular, he noticed that the

22  officer with the remote was asleep and worried that the officer would be startled awake and

23  activate the belt.  Hill claimed that, because of the belt, his demeanor on the stand was "nervous

24  and obnoxious," that he talked abnormally rapidly, and that he was "sweating like a pig."  *Id.*  He

25  worried that his sweat would cause the belt to be activated.  *Id.* at 25.

26        Hill asserted that he told his attorney about the guards' comments and behavior, but that

27  his attorney did nothing.  *Id.*  He acknowledged that he had filed numerous grievances against

28  the jail staff prior to trial.  *Id.* at 30-38.  He filed a complaint about six months before trial after a

6

1   guard allegedly allowed other inmates to beat him up, and another stating that he could not sleep

2   at the jail because of anxiety.  *Id.* at 32.  The jail supervisor testified that Hill did not file a

3   grievance about being shoved by the guards or their alleged comments regarding the stun belt.

4   Pet. Ex. E at 3.

5       Hill's trial counsel, Art Dudley, testified that while he discussed with Hill the possible

6   prejudice that could stem from the stun belt, Hill did not express any kind of concern about the

7   belt.  Dudley recalled only one occasion when Hill was "grumbling" about having to wear the

8   belt, but that it was a "passing moment."  Pet. Ex. H at 14.  The prosecutor also testified that Hill

9   appeared "intense" rather than "tense" during his testimony and was not sweating.  Pet. Ex. D at

10  12-13.

11          **2.      State Court Ruling**

12      There is no evidence in the trial record that either Hill or his counsel claimed that the stun

13  belt affected Hill's testimony; Hill first raised the issue in his state habeas petition.  During the

14  evidentiary hearing, the superior court addressed the California Supreme Court's decision in

15  *People v. Mar*, 28 Cal. 4th 1201 (2002), which requires a showing of manifest need before a

16  defendant is ordered to wear a stun belt in the courtroom.  The court determined that while the

17  record "in totality reflect[ed] a lot of factors which [the court thought] could be taken together to

18  find . . . manifest need for a stun belt," a specific finding of need was never put on the trial

19  record.  Pet. Ex. H at 69.  The court then assumed that "a proper showing of the manifest need

20  [for a stun belt] was not in the record," and proceeded to determine whether this error was

21  harmless.  *Id.*

22      The superior court found that "[n]othing in the trial transcript shows nervousness," noting

23  that neither Hill or his trial counsel complained about the stun belt during trial, even though Hill

24  was "adept at filing grievances."  *Id.*  The court also noted the guard who was alleged to have

25  made the "Charley Tuna" comments denied making them and that the guard, the prosecutor, and

26  Hill's trial counsel all testified that Hill did not appear nervous on the stand and did not appear to

27  be sweating.  *Id.* at 70.  It pointed out that according to his trial counsel, Hill never complained

28  about his treatment by the guards and mentioned the stun belt only in one grumbling remark that

7

did not indicate that he was nervous or had difficulty concentrating. *Id.* Finally, the court found that Hill's testimony was not credible and that the case itself was not "a close call." *Id.* at 71. In denying relief, the court applied the California standard for non-constitutional error articulated in *People v. Watson*, 46 Cal.2d 818, 836 (1956), holding that there was no reasonable probability that the result at trial would have been different if Hill had not worn the stun belt. Pet. Ex. H at 71.

### 3. Legal Standard

Although the Supreme Court has not decided a case involving stun belts specifically, clearly established Supreme Court precedent holds that a defendant may not be placed in physical restraints unnecessarily during trial. *Gonzalez v. Pliler*, 341 F.3d 897, 904-05 (9th Cir. 2003) (finding that the principle dated back to *Illinois v. Allen*, 397 U.S. 337 (1970), and was not confined to a particular type of restraint). A decision to use a stun belt thus "must be subjected to at least the same close judicial scrutiny required for the imposition of other physical restraints." *Gonzalez*, 341 F.3d at 901 (quoting *United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002)). In order to impose physical restraints on a defendant, the court must find expressly that the restraints are justified by a state interest specific to the particular trial. *Crittenden v. Ayers*, No. 05-99006, 2010 U.S. App. LEXIS 17401, at *75 (9th Cir. Aug. 20, 2010) (quoting *Deck v. Missouri*, 544 U.S. 622, 629, 633 (2005). However, at the time of Hill's trial "there was not clearly established law requiring a trial court to take specific procedural steps before imposing physical restraints." *Crittenden*, 2010 U.S. App. LEXIS 17401, at *75-76.

### 4.    Analysis

Hill contends that because the state trial court applied the standard for non-constitutional error rather than the federal standard for constitutional error articulated in *Chapman v. California*, 386 U.S. 18, 24 (1967), this Court must review the evidence independently and conduct its own analysis of prejudice under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), to determine whether the use of the stun belt had a "substantial or injurious effect or influence in determining the jury's verdict." Respondent agrees that the Court must undertake its own harmless error analysis, but she also points out that the superior court's factual findings must be

8

1   presumed correct unless they are rebutted by clear and convincing evidence.  Answer at 18

2   (citing 28 U.S.C. § 2254(e)(1)).  Respondent notes that credibility findings are particularly

3   insulated because federal habeas courts have "no license to redetermine credibility of witnesses

4   whose demeanor has been observed by the state trial court, but not by them."  *Id.* (quoting

5   *Marshall v. Lonberger,* 495 U.S. 422, 433-434 (1983)).

6        Because the trial court did not make a specific finding that the restraints were justified by

7   a state interest, the Court agrees with Hill that there was constitutional error, and the superior

8   court erred in failing to determine if the error was harmless beyond a reasonable doubt as

9   required by *Chapman*.  Accordingly, this Court must undertake its own harmless error analysis

10  to determine whether requiring Hill to wear a stun belt "had substantial and injurious effect or

11  influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623; *See Bains v. Cambra*, 204

12  F.3d 964, 976-77 (9th Cir. 2000) ("Federal district courts should apply the *Brecht* standard when

13  conducting their own independent harmless error review, regardless of what, if any, type of

14  harmless error review was conducted by the state courts.").

15       However, the Court agrees with Respondent that the starting point for that analysis must

16  be the superior court's findings of fact, including its determinations of credibility.  *See*

17  *Sophanthavong v. Palmateer*, 378 F.2d 859, 1059-60 (9th Cir. 2005) ("Because the state court

18  conducted an evidentiary hearing in which [the defendant] testified, we are required to defer to

19  the state court's credibility findings.").  It is the defendant's burden to demonstrate prejudice.

20  *Gonzalez*, 341 F.3d at 903.  Here, there is nothing in the record that would permit this Court to

21  disregard the trial court's determination that Hill's testimony with respect to the effect of the

22  stun belt on his trial testimony lacked credibility.

23       Hill contends that his testimony was corroborated by correction officers who testified that

24  the belt was tested in front of him each day in part to provide a "visible shock," and that he

25  received warnings (albeit in a less colorful manner than that to which he testified) that

26  highlighted the potential for immobilization, self-defecation, and self-urination.  *See* Pet. Ex. D

27  at 23-24.  However, evidence that Hill received such warnings is insufficient to overcome the

28  superior court's credibility determination.  The jail supervisor testified that along with the

9

1    demonstration, Hill was given instructions about how to avoid activation of the stun belt and

2    about signals giving him a reasonable time within which to stop any prohibited behavior before a

3    charge would be delivered.  *Id.*  Moreover, nothing in the record shows Hill was visibly nervous

4    or made more than a passing comment about the stun belt.  Finally, there is no evidence tha the

5    jury had any knowledge that Hill was wearing the belt.

6    **B.    Kidnapping Jury Instruction**

7          Hill next claims that the trial court erred in failing to instruct the jury that where the

8    alleged victim is unconscious, the jury must find that the person was moved for an illegal

9    purpose in order for the defendant to be convicted of kidnapping.  Because neither the defense

10   nor the prosecution offered evidence at trial that L was moved for an innocuous purpose, it was

11   not unreasonable for the state appellate court to rule that such an instruction was unnecessary.

12         **1.    Background**

13         Under California law, kidnapping generally has three elements (1) a person was

14   unlawfully moved by use of physical force or fear; (2) the movement was without the person's

15   consent; and (3) the movement of the person was for a substantial distance.  *People v. Jones*, 108

16   Cal. App. 4th 455, 462 (citing Cal. Penal Code § 207).  However, in *People v. Oliver*, 55 Cal. 2d

17   761 (1961), the California Supreme Court determined that in order to read § 207 in accordance

18   with the spirit of its enactment, the statute would be construed to include kidnapping of an

19   immature or incapacitated victim "only if the taking or carrying away is done for an illegal

20   purpose or with an illegal intent."  *Oliver*, 55 Cal. 2d at 768.  *Oliver* held that equity required

21   such a reading because "[m]any situations readily suggest themselves under which a minor,

22   unable to give his consent because of his immature years, might be forcibly taken and

23   transported by an adult for a good or innocuous purpose, and in which it would be unthinkable

24   that the adult should be guilty of kidnapping," and that the same could be true of carrying away

25   an adult who was intoxicated or unconscious in order to move them to safety or seek medical

26   attention.  *Id.*

27         Here, the prosecution argued that the jury could find that the kidnapping of L commenced

28   at any of three times: (1) when L got into the vehicle with Hill, (2) after Hill choked L into

10

1  unconsciousness on the road to his residence, or (3) after L regained consciousness before she

2  was driven into the trees where she was raped.  Referencing the jury instructions as to consent,[5]

3  the prosecutor stated that "the portions of travel when she's unconscious automatically means

4  it's not consensual because of the instruction that says she has to have knowledge she was being

5  physically moved."  RT 1060.

6        Before the jury, defense counsel argued at length that L never was unconscious and that

7  she actively consented to the movement at issue.  Despite this, counsel urged that, based on

8  *Oliver*, the jury be given the instruction that "where the alleged victim of a kidnapping is

9  incapable of consent due to unconsciousness, the defendant is guilty of kidnapping only if the

10  movement of the victim was done for an illegal purpose."  Pet. at 22 (quoting CALJIC No. 9.57).

11        **2.**     **State Court Ruling**

12        The trial court rejected the proposed instruction on the basis that "[w]hen a defendant

13  assaults his victim and himself creates the very unconsciousness which prevents the victim from

14  communicating lack of consent, he's to be judged by the basic law of kidnapping.  He cannot

15  create an equitable exception to the basic law of kidnapping by first battering the victim into

16  unconsciousness."  Pet. Ex. A at 21.  The court determined that a defendant "should not be

17  allowed to convert simple kidnapping into a specific intent crime by first rendering a victim

18  unconscious by means of a general intent assault."  *Id.*

19        The state appellate court affirmed.  Relying on the rule that "a trial court must give a

20  requested instruction only if it is supported by substantial evidence, that is, evidence that

21  deserves jury consideration," *id.* (citing *People v. Marshall*, 15 Cal. 4th 1, 39-40 (1997)), the

22  appellate court concluded that none of the circumstances articulated in *Oliver* was presented in

23

24           [5]CALJIC No. 9.56 reads: "When one consents to accompany another, there is no

25  kidnapping so long as the condition of consent exists.  To consent, a person must: One, act freely
   and voluntarily and not under the influence of threats, force, or duress; two, have knowledge that

26  she was being physically moved; and three, possess sufficient mental capacity to make an
   intelligent choice whether to be physically moved by the other person.  Being passive does not

27  amount to consent.  Consent requires a free will and positive cooperation in act or attitude."  CT
   422; RT 1135-36.

28

this case under any version of the relevant events.  The appellate court noted that in *Oliver* there was evidence to support the argument that the defendant had an innocent purpose for taking the child victim away. *Id.* (citing *Oliver*, 55 Cal. 2d at 768.).  In this case, by contrast, the appellate court found that there was "no testimony indicating that L was taken deeper into the wilderness out of concern for her safety or wellbeing." *Id.* at 22.  L's testimony was that Hill choked her until she passed out then took advantage of her unconsciousness to take her into the wilderness to isolate her.  The defense argued that L never was unconscious during the trip.  Because there was no evidence to support the conclusion that Hill moved an unconscious L out of solicitude for her health or safety, the appellate court concluded the instruction was unwarranted.  *Id.*

### 3.   Legal Standard

"The fact that a jury instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Johnson v. Sandor*, No. 08-17210, 2010 U.S. App. LEXIS 19601, at *2 (9th Cir. Sept. 21, 2010) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).  The only question for a federal habeas court when considering an allegedly incorrect jury instruction is whether the ailing instruction by itself so infects the entire trial that the resulting conviction violates due process. *Id.*  A defendant has the right to have every element of a crime proven beyond a reasonable doubt; "a state court is not free to define an element out of existence, or to ignore the element entirely when upholding a criminal conviction." *Goldyn v. Hayes*, 444 F.3d 1062, 1070 (9th Cir. 2006) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979).  Within those limits however, a state supreme court has "wide latitude" in defining and interpreting the elements of state crimes, which a federal court cannot reexamine on habeas review.  *Id.*

### 4.   Analysis

Hill argues that in an alleged kidnapping where a victim is incapable of giving consent, the prosecution must prove that "the movement [of the victim was] for an illegal purpose."  Pet. Traverse at 7.  Hill contends that because an instruction to the effect was not given here, the jury could have found that "movement of an unconscious victim is *per se* kidnapping," relieving the prosecution of its burden of proving each element of crime beyond a reasonable doubt.  Pet. at 28 (citing *Francis v. Franklin*, 471 U.S. 307, 314 (1984)).  The state appellate court concluded that,

1   under California law, the prosecution is not required to prove that the movement of the victim

2   was for an illegal purpose any time it alleges the victim was rendered unconsciousness or

3   incapacitated.  As noted above, the appellate court distinguished *Oliver* on the basis that in that

4   case there was substantial evidence of an innocuous reason for moving the child and no evidence

5   that the defendant had caused the child's incapacity.

6        Hill attempts to retreat from the defense position at trial that L never was unconscious

7   during the ride to Hill's property, claiming that "it was uncontroverted that [L] was unconscious

8   at two of the moments when the prosecution theorized that the kidnapping began."  Pet at 25.

9   However, Hill's claim cannot be reconciled with the trial transcript, and the defense closing

10   argument focused extensively on evidence that L never was unconscious at the relevant time.

11   *See, e.g.*, RT 1089 (argument that witnesses heard Hill speaking to an apparently conscious

12   passenger when he stopped at the house, "If someone is unconscious in a vehicle, as [the

13   prosecutor] wants you to believe, if there's a person there in that vehicle at that point in time that

14   has been strangled into unconsciousness, [would you] have the person upright in the vehicle?  Or

15   are you going to talk to the person, saying, [']stay there, don't get out of the car,['] words to that

16   effect?").

17        Particularly in light of the highly deferential standard of AEDPA, this Court cannot

18   conclude that the state appellate court was unreasonable in determining that "movement for an

19   illegal purpose" is not a necessary element of kidnapping..  Nor was the appellate court

20   unreasonable in its determination that there was insufficient evidence to support Hill's requested

21   jury instruction.

22   **C.**    **Exclusion of Prior Consistent Statement**

23        Hill next contends that the trial court erred by excluding a prior consistent statement as to

24   how the victim sustained her injuries.  The state appellate court reasonably determined that any

25   error was not of constitutional dimension.

26        **1.**    **Background**

27        Prior to his arrest, Hill provided a taped statement to the police in which he claimed that

28   L's injuries were caused by a collision with the console in the truck.  RT 886, 901.  At trial, Hill

13

1    testified that L had attacked him and had tried to grab the steering wheel from him while he was

2    driving, and that he hit and elbowed her to fend her off.  RT 740-750.  On cross-examination,

3    Hill admitted that he had learned subsequent to this statement that laboratory tests had shown

4    that there was no blood or tissue on the console.  RT 887.  The defense offered testimony that in

5    a separate, earlier police interview, Hill had stated that he pushed and elbowed the victim.  RT

6    901.  The trial court determined that the testimony was inadmissible as a prior consistent

7    statement because Hill had a motive for fabrication at the time the statement was made.  RT 902.

8    In his closing argument, the prosecutor discredited Hill's trial testimony by pointing out that Hill

9    had changed his story after learning about the test results.  *See* Pet. Ex. A at 13.

10          **2.      State Court Ruling**

11          The state appellate court concluded that the exclusion of evidence was error under state

12   law, which provides that "a prior consistent statement is admissible as long as the statement is

13   made before the existence of any one of the motives the opposing party expressly or impliedly

14   suggests may have influenced the witness's testimony." Pet. Ex. A at 14 (quoting *People v.*

15   *Noguera*, 4 Cal. 4th 599, 629 (1992)).  However, the court also concluded that the exclusion did

16   not deprive Hill of due process.  *Id.* at 15.

17          According to the state appellate court, "[o]ne prior consistent statement would not have

18   sufficiently bolstered the defendant's credibility."  *Id.*  The court noted that Hill had been caught

19   in a number of self-contradictions, that his trial testimony differed from what he told his

20   housemates and others, that his description of his relationship with the victim was contradicted

21   by letters and messages, and that he admitted lying to his probation officer.  The appellate court

22   also noted the trial judge's comments to Hill at sentencing:  "what's really offensive is you lied

23   through your teeth throughout the trial . . . . I don't know if I've heard you make a truthful

24   statement the entire trial, trying to twist everything to your benefit.  Clearly, you committed

25   perjury and the jury so found in their findings."  *Id.*  The appellate court concluded that, "[g]iven

26   the conclusive evidence of the defendant's utter lack of veracity, we conclude that his credibility

27   would not have been significantly bolstered by evidence of his prior consistent statement." *Id.* at

28   16.

Case No. 05:05-cv-4514 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC3)

1

### 3.    Legal Standard

A federal court may not collaterally review a state court evidentiary ruling unless the ruling violates federal law, either because it runs afoul of a specific constitutional provision or it infringes the due process right to a fair trial.  28 U.S.C. §2254(a); *Rivera v. Illinois*, 129 S. Ct. 1446, 1454 (2009).  Generally, states "have broad latitude . . . to establish rules excluding evidence from criminal trials," although that discretion does have constitutional limits.  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  While the Supreme Court has held that, "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," *id.* (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), it is equally clear that *Chambers v. Mississippi*, 410 U.S. 284 (1973), and its progeny do not "stand for the proposition that the accused is denied a fair opportunity for a trial whenever a state or federal rule excludes favorable evidence," *United States v. Scheffer*, 523 U.S. 303, 316 (1998).  The question is whether the exclusion of evidence "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Egelhoff*, 518 U.S. at 47.  It is the defendant, not the prosecution, who bears the "heavy burden" of demonstrating that the evidentiary ruling violated a fundamental principle of justice.  *Egelhoff*, 518 U.S. at 43.

### 4.    Analysis

Hill contends that the instant case is indistinguishable from *Chambers*, and that this Court must conduct its own review under *Brecht* to determine if the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Pet. Traverse at 8 (quoting *Inthavong v. Lamarque*, 420 F.3d 1055, 1059-60 (2005)).  In fact, however, this case is easily distinguished from *Chambers*.  In that case, the excluded testimony that someone else had confessed to the crime was "critical to Chambers' defense" and bore "persuasive assurances of trustworthiness."  410 U.S. at 302; *see also Perry v. Rushen*, 713 F. 2d 1447, 1452 (9th Cir. 1983) (noting that the evidence in *Chambers* and related case was both "highly exculpatory" and "crucial to the defense").  Neither of those elements is present here.

While the prior consistent statement might have bolstered defendant's credibility as to a relevant issue, Hill's defense did not hinge on that issue.  Hill was able to testify as to how L's

15

1  injuries occurred, and the defense was able to argue that Hill's explanation was more consistent

2  with the physical evidence.  *See, e.g.*, R.T. 1083 (defense closing argument) ("The physical

3  makeup in the care and what happens and her injuries are consistent with elbowing with Mr.

4  Hill's right elbow.").  The defense also was able to point to testimony confirming that Hill did

5  not deny injuring L until after he learned of the test results from the console.  RT 1088 (defense

6  closing argument) (noting that "before he even makes the statement" he "[q]uite candidly" told

7  Mr. Benedict "I hit her," Mr. Canabou "I hit her," and Mr. DiMarco "I pushed her around.").

8       Because Hill has not shown that the trial court's ruling violated a fundamental principle

9  of justice, the state appellate court correctly determined that the error was not of constitutional

10 dimension.

11 **D.    Ineffective Assistance of Counsel**

12      **1.    Background**

13      Hill claims that his counsel rendered ineffective assistance by failing "to investigate

14 whether any residents of the Larsen Road property heard or saw [Hill] leave the property to go to

15 the Arco station and later return."  Pet. at 32.  In particular, Hill claims that counsel did not

16 determine whether the Vincent family, which occupied a house on the property near the road,

17 could corroborate Hill's testimony that he and L had left the property to buy cigarettes at around

18 2 a.m. and returned around 4 a.m.

19      At the evidentiary hearing, Hill's trial counsel, Dudley, testified that he had interviewed

20 Hill regarding possible witnesses, including witnesses along Larsen Road, and that Hill had not

21 identified the Vincents as relevant witnesses.  Pet. Ex. G. at 7, 9.  Dudley stated that when he

22 asked Hill before trial about the people who lived in the Vincent house, Hill could not provide

23 any names, though at some point Hill indicated that the family had moved to Australia.  *Id.* at 29,

24 34.  Dudley testified that it was his understanding that Hill "had talked to people on the property

25 that were up there and that there was not useful information from the people at that place."  *Id.* at

26 32.  Dudley said his general practice was that "if the client says this person has useful

27 information . . . then we proceed and interview those people.  When [he] hear[s] that someone

28 has no useful information, then that's where that generally stops."  *Id.* at 35.

16

Dudley also discussed with Hill the fact that his statements to the police were inconsistent with what Hill had told Dudley about his trip to the Arco station. *Id.* at 12.  Dudley attempted to obtain the videotape from the station, but he was given the wrong date, and later learned that the correct day's tape no longer existed. *Id.*  Hill testified that he had told Dudley that the Vincents were living in the house and denied telling him that they had moved back to Australia.  Pet. Ex. H at 45.

Colin Vincent testified at the evidentiary hearing that he was at the Larsen Road house on the night in question.  He claimed that around 2 a.m. he saw an SUV or Chevy Blazer drive past his house up to what he assumed was Hill's house and then up towards the barn.  Pet. Ex. B at 6, 8.  He thought that it looked like a vehicle that he had seen Hill drive before. *Id.*  Later that night, he noticed what he believed to be the same vehicle drive down toward the gate, and that he thought he saw two people in the vehicle; he did not notice the time. *Id.* at 8.  Finally, at 3:50 a.m., he saw what he again thought was the same vehicle proceed back towards Hill's house. *Id.* at 10.  Vincent did not notice the color of the vehicle, did not see it go to Hill's house, and did not notice any damage to the vehicle. *Id.* at 40-53.

A week after the incident, Vincent moved from the Larson Road house, but maintained a local mailing address until he returned to Australia in December 1999. *Id.* at 14.  More than a year later, after learning of Hill's conviction, Vincent contacted Hill's mother and then Dudley.  He told Dudley: "I just said where I lived.  I said I'd seen [Hill] on the tractor on the Sunday morning, about, about noon.  Waved to him, and [Dudley] said, well, there is an appeal going on.  Sort of left it at that basically." *Id.* at 17.  Vincent did not tell Dudley anything about the events of the previous evening. *Id.*  Vincent later contacted Hill's mother a second time, and when he learned that there was an issue as to whether Hill had left the property that night, he offered to speak to Dudley again. *Id.* at 18.  Hill's mother told Vincent not to contact Dudley, as they were getting different counsel. *Id.*  Vincent then received a letter from Hill asking what he had seen that night. *Id.*

### 2.    State Court Ruling

At the conclusion of the evidentiary hearing, the superior court found that Dudley's

Case No. 05:05-cv-4514 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC3)

1    performance was reasonably effective.  Pet. Ex. H.  The court found Dudley more credible than

2    Hill, specifically with respect to whether Hill had identified Vincent as someone who might have

3    information about the events in question.  *Id.* ("throughout this case there's been credibility

4    issues with the Defendant both at the trial phase and the habeas phase.").  The court also noted

5    that whether Hill left the property and returned again that night was a collateral matter.  *Id.* at 66-

6    67.  The court found that Hill had told Dudley that Vincent had left the country, or at least the

7    property, and that investigation would have required more than simply knocking on doors around

8    the property.  *Id.* at 67.

9           The court found that while Vincent was a very credible witness, the absence of his

10   testimony did not result in prejudice to Hill.  *Id.*  The court pointed out that Vincent was not sure

11   if the vehicle was associated with Hill, that there was some question as to whether he had seen

12   two silhouettes, and that while L testified to not having left the property she also acknowledged

13   that she had dozed off and lost consciousness at times.  *Id.* at 68.  It also noted that "the whole

14   record is replete with other damaging evidence."  *Id.*

15          **3.      Legal Standard**

16          The framework for analyzing claims of ineffective assistance of counsel is articulated in

17   *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Williams*, 529 U.S. at 390 (applying

18   *Strickland* as the "clearly established federal law" that governed petitioner's

19   ineffective-assistance claim).  Under *Strickland*, an attorney's inadequate representation does not

20   rise to the level of a constitutional violation unless the deficiency so infected the adversarial

21   process as to raise doubts about the reliability of the proceeding's outcome.  *Id.* at 687.

22   *Strickland* creates a two-prong test.  To prevail on a claim of ineffective assistance of counsel, a

23   defendant must prove (1) that his counsel's performance was deficient, and (2) that he suffered

24   prejudice as a result.  *Id.*  To be deficient, an attorney's conduct must fall below an "objective

25   standard of reasonableness" established by "prevailing professional norms." *Id.* at 687-88.

26   Because of the "difficulties inherent in making the evaluation," a "defendant must overcome the

27   presumption that, under the circumstances, the challenged action might be considered sound trial

28   strategy."  *Strickland*, 466 U.S. at 694.

1

**4.    Analysis**

2      Hill contends that Dudley's reliance on his interview with Hill rather than independent

3 investigation fell below prevailing professional norms.  He argues that in light of *Rompilla v.*

4 *Beard*, 545 U.S. 374 (2005), "no reasonable lawyer would forgo an independent investigation of

5 critical witnesses and instead rely on interviews with the defendant or his family relations

6 regarding whether they recalled anything 'helpful or damaging' to the witnesses' testimony."

7 Pet. Traverse at 9.

8      *Rompilla* does not support such a broad proposition.  In fact, the Court stated that "the

9 duty to investigate does not force defense lawyers to scour the globe on the off chance something

10 will turn up; reasonably diligent counsel may draw a line when they have good reason to think

11 further investigation would be a waste."  545 U.S. at 383.  Instead, the case turned on counsel's

12 failure to examine the court file from Rompilla's prior conviction, which the prosecution itself

13 twice had brought to the attorney's attention.  *Id.* at 383-84.  The Court noted that under the

14 ABA Standards for Criminal Justice, a defense investigation "should always include efforts to

15 secure information in the possession of the prosecution and law enforcement authorities."  *Id.* at

16 387.

17      Dudley's failure to locate and interview Vincent involves exactly the distiniction between

18 diligence and waste that the Supreme Court in *Rompilla* indicated that it would not second guess.

19 The superior court found specifically that Vincent was not identified before trial as someone

20 with potentially relevant information.  The court also found that Dudley was told that Vincent

21 had left the area and possibly the country.  Finally, the court concluded that whether Hill had left

22 the property on the night of the incident was a collateral issue and that Dudley had made a

23 reasonable effort to seek corroboration at the Arco station of Hill's account.  The superior court's

24 determination that Dudley's performance was reasonably effective is is not unreasonable.

25 Accordingly, the Court need not reach the question of whether Hill was prejudiced by Dudley's

26 performance.

27

28

Case No. 05:05-cv-4514 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC3)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III. ORDER

The petition for writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**

DATED: 11/10/2010

_____
JEREMY FOGEL
United States District Judge

Case No. 05:05-cv-4514 JF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
(JFLC3)